25 C.C.P.A. (Patents)

## ADAMS et al. v. STULLER.
### Patent Appeal No. 3878.

Court of Customs and Patent Appeals.
Feb. 7, 1938.

Frederick S. Duncan and John H. Hilliard, both of New York City, for appellants.

C. Paul Parker and W. Mercer Alexander, both of Chicago, Ill., for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an appeal in an interference proceeding wherein the Board of Appeals of the United States Patent Office affirmed a decision of the Examiner of Interferences awarding priority of invention as to all the counts in issue to appellee.

The interference arises between an application filed by appellee on May 14, 1932, and an application filed by appellants on November 8, 1932. Appellants being the junior parties, the burden was upon them to establish priority of invention by a preponderance of the evidence.

There was originally a third party to the interference, but he failed to continue the prosecution of his case before the Examiner of Interferences and judgment upon the record was entered against him, from which he took no appeal.

The issue consists of three counts, of which count 1 is illustrative and reads as follows: "1. In a buckle of the character described, a frame having a base for supporting the adjacent portion of a strap, a cam lever journaled on the frame to swing into and out of engagement with the adjacent portion of the strap for clamping and releasing the same upon and from the base as the cam is rocked in reverse directions, said cam having an operating handle extending toward the entrant end of the buckle, the free end of the clamped strap being adapted to be returned over and upon the handle of the lever, and lugs on the frame overhanging the returned end of the

strap for holding the lever in its clamping position."

The involved invention is sufficiently described in the above-quoted count. The buckle, the subject of the count, is designed primarily for use in emergency tire chains for automobiles.

Appellants' application states: "This invention relates to a strap buckle of the cam lever type adapted to be used more particularly in connection with traction chains for vehicle wheels, but obviously may be used in any other relation where a firm grip and quick release of the strap are desired."

In appellee's application the following is stated:

"The invention relates generally to tire chains and in particular to the type generally known as emergency chains wherein one or more of the chains are adapted to be secured to the wheel of a vehicle without moving the vehicle or raising the wheel.

"A general object of the invention is to provide a device of this character which is sturdy, efficient in operation, may be readily and permanently secured in operative position until the operator removes same, and which may be manufactured and sold at a low cost.

"Another object is to provide, in an emergency tire chain, means for fastening the chain on the vehicle wheel which is simple and convenient to use and which cannot become accidentally disengaged."

Appellants' preliminary statement alleged conception of the invention on June 17, 1931, and its reduction to practice on June 26, 1931.

Appellee, in his preliminary statement, alleged conception of the invention on or about November 1, 1930, disclosure to others on or about December 1, 1930, and reduction to practice on or about February 1, 1931.

Both sides took testimony.

The Examiner of Interferences made no findings with respect to the time of conception or reduction to practice of the invention by appellants, but found that appellee conceived the invention and reduced it to practice prior to appellants' alleged date of conception and that there was no concealment, suppression, or abandonment of the invention by him. The examiner therefore awarded priority of invention to appellee.

The Board of Appeals held that appellants had completed the invention "during the Fall of 1931," but agreed with the Examiner of Interferences that appellee had conceived the invention and reduced it to practice prior to the conception of the invention by appellants, and also agreed that there had been no suppression, concealment, or abandonment of the invention by appellee. Therefore the Board of Appeals affirmed the decision of the Examiner.

The only issue before the Patent Office tribunals was one of fact, and that is the only issue before us.

The principal matter in controversy is the question of whether or not appellee reduced the invention to practice before appellants entered the field, for it is conceded by appellants, as we understand it, that appellee conceived the invention before March, 1931; at any rate, the Patent Office tribunals so found, and we agree.

It appears that appellee was employed by the Western Chain Products Company of Chicago, the assignee of his application, and had been so employed since September 18, 1930. He testified that he conceived the involved invention on or about November 1, 1930; that he made a sketch embodying the invention on January 5, 1931, and a few days thereafter made a full-sized model from said sketch, which model was introduced in evidence as appellee's Exhibit 6; that about the end of January, 1931, he made another sketch of the invention, and from such sketch another full-sized model was made about the first of February, 1931, which model was introduced in evidence as appellee's Exhibit 8. These exhibits are complete tire chains.

Each of Exhibits 6 and 8 satisfies the terms of the counts before us, but they differ in construction in that Exhibit 6 has a small prong on the clamping arm of the lever, while Exhibit 8 has only three shallow notches on such arm.

The testimony establishes that Exhibit 6 was placed upon a rear wheel of a Ford car and driven around several of the paved city streets. We do not deem it necessary to analyze the testimony respecting this test or further discuss it.

With respect to Exhibit 8, we think it is fairly established by the testimony that this exhibit and three other chains similar to it were tested in February, 1931, and again in March, 1931.

With respect to the test of February, 1931, one William P. Seymour, purchasing

agent of the Western Chain Products Company, testified that two chains like Exhibit 8 were placed on each of the rear wheels of a car; it further appears from the record that the said Seymour was accompanied during the test of February, 1931, by one Charles J. Colling, hereinafter referred to. Seymour further testified that he drove around the streets for two or three miles, and that he observed the condition of the chains after he returned. He further testified:

"Q. 51. How much of a test was that particular one? What did you do? A. Well, we just drove around the streets, around the factory there, for two or three miles.

"Q. 52. Was there one or more chains like Exhibit 8 on the car during that test? A. There was four.

"Q. 53. Where were they, what wheels, and how many on each wheel? A. Two on each rear wheel.

"Q. 54. About how far did you drive on that test? A. Oh, about three miles.

"Q. 55. Were you personally in the car during the entire trip? A. Yes, I was.

"Q. 56. Did you see the chains put on? A. Yes, sir, I did.

"Q. 57. And did you observe the condition of the chains on the wheels after you returned? A. Yes, I did.

"Q. 58. Did you notice any failure of functioning of the buckle or any slippage of the strap in the buckle when you returned? A. No, they seemed to be all right.

"Q. 59. What was the next test you had to do with of chains like Exhibit 8? A. Sometime later, we made a later test in March, 1931.

"Q. 60. Who was with you on that test? A. Mr. Colling.

"Q. 61. Anyone else? A. That is all."

Said Seymour further testified that in the March test four chains were used, of which Exhibit 8 was one, two chains being on each of the rear wheels of the car; that there was melting snow on the ground and the pavement was wet; that they drove a considerable distance over paved streets and for three or four blocks over unpaved, muddy, roads; that they got out in the mud once. He further testified that when the trip was over he examined the straps and buckles and, quoting his language, "We found that they were O. K." He further testified as follows:

"Q. 85. You mean by that the units were acting properly on the wheels, do you? A. That is right."

On cross-examination the witness testified as follows:

"X-Q. 202. You did not put them on and did not know whether they worked satisfactorily, did you? A. They looked all right to me.

"X-Q. 203. But you don't know whether they were or not? A. No, sir."

Immediately following this testimony, upon redirect examination, the witness testified as follows:

"R-D. Q. 204. Were you able, from your observation of the chains, when you got out on that test, to tell whether the strap had slipped in the buckle, or whether the chain unit had moved out of proper position on the wheel or general things like that? A. Why, yes, you could tell by looking at it. It was on straight, and the strap was tight."

The witness Colling testified that he was with Seymour during both the February and March tests. His testimony with respect to the March test is substantially the same as that given by said Seymour. With respect to the condition of the chains after the trip was over, said Colling testified as follows:

"Q. 129. Did you observe these chains when you got back to the Western plant before they were taken off the wheels of the car? A. Yes.

"Q. 130. How critically did you observe them? Can you state whether there was any change in their condition, or whether the buckles or fasteners had held the strap without slippage? A. Yes, they held the strap without slippage; that is the reason I was critical on it.

"Q. 131. Have you had considerable experience with the action of tire chains of various kinds on automobiles? A. Not so much.

"Q. 132. Will you state whether or not you consider that particular test to be a mild test or severe test for an emergency chain? A. A very severe test for an emergency chain.

"Q. 133. What was your conclusion when you got back to the Western plant as to whether these particular chains like Ex-

hibit 8 had performed satisfactorily or not? A. I thought it done its job pretty well."

It is the contention of appellants that, assuming the testimony of the witnesses Seymour and Colling to be true, the tests given Exhibit 8 were not sufficient to constitute a reduction to practice of the invention; that appellee's application shows that his buckle was designed for emergency tire chains, and that such chains are subjected to much more severe stresses and strains than Exhibit 8 was subjected to in the tests given; that the strap of Exhibit 8 shows upon visual inspection such wear, as a result of the tests, as to negative a successful reduction to practice of the invention; that for a period from March, 1931, until the early part of 1932, both appellee and his assignee were wholly inactive with respect to the invention, and that in 1932 further tests were made, thus indicating that the tests of Exhibits 6 and 8 were unsatisfactory; that, while no actual tests sufficient to constitute a reduction to practice of the invention by appellants are established by the record, the fact that thousands of sets of the chains embodying the invention were manufactured and sold to the public by appellants' assignee, the Triumph Trap Company, before any date of reduction to practice to which [as appellants contend] appellee is entitled, constitutes a reduction to practice of the invention by appellants, and that appellee was lacking in diligence in reducing the invention to practice at the time that appellants entered the field.

Appellants further challenge the identification of Exhibits 6 and 8, as those that were tested by appellee's witnesses.

■ At the outset, we would observe that, upon all the material facts in the case, there were concurring decisions by the Patent Office tribunals, and the rule is here applicable that such decisions will not be disturbed by us unless they are manifestly wrong. However, it is our opinion upon the merits of the case that such tribunals came to the right conclusion.

We think the evidence fairly establishes that Exhibits 6 and 8 were made prior to March, 1931, and tested in the manner testified to by the witnesses on behalf of appellee. It is also our opinion that the test given Exhibit 8 in March, 1931, was sufficient to constitute a reduction to practice of the invention. We do not think any such extreme tests as are urged by appellants' counsel were necessary.

■ A car equipped with chains embodying the invention was driven several miles over paved roads, and for several blocks over a wet, muddy, and unpaved road. At the conclusion of the trip the chains were found intact upon the wheels, and there had been no slipping of the belt in the buckle; in other words, the buckle embodying the invention served the purpose for which it was designed. The fact that the strap of Exhibit 8 is somewhat worn we do not regard as of any particular importance.

It is significant that this test was much more severe than the test given appellants' buckle before their assignee engaged in commercial production upon a large scale of tire chains embodying the invention.

Appellants introduced in evidence Exhibit 3, a tire chain embodying their invention. With respect to this exhibit appellant Adams testified as follows:

"X-Q. 122. When you stated in your preliminary statement that you and Mr. Ennis reduced the invention of the counts in issue to practice on June 26, 1931, what event are you referring to as constituting that reduction to practice? A. The fact that the entire chain had been put on a car and driven."

Appellant Ennis, the coinventor with Adams, testified as follows:

"Q. 17. Did you ever test the chain and buckle of exhibit 3? A. Yes, many times.

"Q. 18. When was the first test? A. It was actually tried out on a car, I believe, the very next day, the 25th, because when we got it the day of the 24th we were pressed for time, and I know very well we tried it the next day.

"Q. 19. Was the test successful or unsuccessful? A. Quite successful.

"Q. 20. What do you mean by "quite successful"? A. Well, the strap held and it seemed to work sufficiently well. On the test on the road it didn't drag out, it held.

"Q. 21. About how long was the test on the road? A. To Verona and back.

"Q. 22. How many miles? A. I believe Verona is about five miles.

"Q. 23. From where? A. From Oneida."

It is true that appellants do not claim that any tests given by them to their own

invention constituted a reduction to practice, and state that commercial production was entered upon by their assignee before there had been any reduction to practice of the invention.

It is contrary to common business experience that appellants' assignee would have expended large sums of money if appellants had not been satisfied that the tests given the invention, much less severe than the tests given appellee's invention, were sufficient to establish the utility of the invention.

While the facts last above recited are in nowise controlling here and only of minor importance, we point to them as some indication that appellants' position now, as to the extent of the tests necessary to constitute a reduction to practice, is due principally to the exigencies of the case before us. In this statement we do not reflect in any way upon appellants' counsel.

With respect to appellee's conduct regarding the invention subsequent to the March test of Exhibit 8, we do not think the evidence establishes that the invention should be regarded as an abandoned experiment.

One William A. Oink, a witness on behalf of appellee, testified that he was a buyer for Sears, Roebuck & Co., and had been such buyer for 16 years; that some time in February, 1931, the witness Colling endeavored to sell him chains embodying the involved invention, but that he did not give him an order at that time, and that not until March, 1932, did they give an order for such chains. He further testified as follows:

"X-Q. 74. Would it be impossible that you had first these chains of the type of Exhibits 6 or 8 about the time of receiving the 1932 quotations? A. No. If we had no record of experience behind them we would never have taken them on. We had to have those chains sometime in 1931 or we would never have taken them on in 1932.

"X-Q. 75. What tests did you make in the winter of 1931? A. Run them around the roads in the snow; turned corners with them; the usual things.

"X-Q. 76. Who made those tests? A. I made some. I made some in company with Mr. Colling. I don't know whether Mr. Hill was with us or not. Some of the other boys tried them out."

Arthur W. Hill, president of the Western Chain Products Company, testified that approximately one-half of the total volume of sales of said company was to Sears, Roebuck & Co.

It appears that early in 1932 another model of the invention was made by appellee, introduced in evidence as Exhibit 9, which is identical with Exhibit 8 except that in Exhibit 9 the buckle is integral with the spreader, as distinguished from Exhibit 8 where the buckle is connected to the spreader by a link. Also the strap of Exhibit 9 is of fabric, whereas in Exhibit 8 it is of leather. This model, Exhibit 9, was hand made, and another model identical with it, but machine made, represents the chain sold to Sears, Roebuck & Co., which model was introduced in evidence as Exhibit 10.

Very extensive tests of Exhibit 9 were made, from which appellants' counsel argues that appellee did not regard the tests of Exhibit 8 as being successful, and that hence the tests of Exhibits 6 and 8 should not be regarded as a reduction to practice of the invention.

It is well established that, to constitute a successful reduction to practice of an invention, the device need not be perfect in its operation; but it is enough if it actually and mechanically performs, though in a crude way, the function for which it is designed. Hildreth v. Mastoras, 257 U.S. 27, 42 S.Ct. 20, 66 L.Ed. 112.

The buckles in Exhibits 8 and 9 seem to be identical in structure, with the exception noted, and the fact that appellee made extensive tests of Exhibit 9, which differs from Exhibit 8, should not be regarded as negativing a successful reduction to practice of Exhibit 8.

Appellee's assignee, early in 1932, was preparing to engage in the commercial production of the involved invention, and the witness Hill testified that about $50,000 worth of chains embodying the invention were sold to Sears, Roebuck & Co. We think that, under the circumstances, tests of the invention in its commercial form, embodied in a tire chain, were natural, even though the invention had been reduced to practice long before that time.

While the record does not establish any activity on the part of appellee or his assignee with respect to the invention from March, 1931, until the early part of 1932,

there is no evidence of suppression, concealment, or abandonment by either appellee or his assignee, and there is no evidence that either of them was spurred into activity through knowledge of appellants' invention.

Sears, Roebuck & Co. was the principal customer of appellee's assignee. Said witness Oink, the buyer for said company, testified as follows:

"X-Q. 68. Were there any quotations on these double emergency chains submitted to you after the letter of March 6th, 1931? A. You mean during 1931?

"X-Q. 69. Yes, during 1931? A. No.

"X-Q. 70. Or 1932? A. No. We turned it down and when the due date goes over, there is no use quoting us any more, we could not use them.

"* * * X-Q. 71. What due date are you referring to? A. The due date for the catalog for 1931-1932, winter, was past. We would not be interested in any more quotations until next winter's catalog was in process of preparation.

"* * * X-Q. 72. So you received only one quotation during 1931? A. Yes.

"X-Q. 73. What was the first quotation you received in 1932? A. I can dig it up, if you like. It must be about the same time that we got the quotation in 1931. It should be, because that would be about when the 1932 book was being prepared. I do not know if it is in this file, but it should be. March 29, 1932, we were quoted on our 1932 basis."

From this it appears that Sears, Roebuck & Co. would not further consider purchasing chains involving the invention until early in 1932.

We hold that appellee reduced the invention to practice prior to the entry of appellants into the field. The record does not establish concealment, suppression, or abandonment after the invention had been reduced to practice by appellee in March, 1931, and there is no evidence that appellee or his assignee was spurred into activity with respect to the invention through knowledge of appellants' invention. Therefore priority of invention was properly awarded to appellee.

For the reasons stated herein, the decision of the Board of Appeals is affirmed.

Affirmed.